423 A.2d 713

**Joel STRAUP, Preston Straup and Emerson Kriebel, Appellants,**

v.

**The TIMES HERALD.**

Superior Court of Pennsylvania.

Argued March 20, 1979.

Filed Aug. 29, 1980.

Reargument Denied Jan. 8, 1981.

Petition for Allowance of Appeal Denied March 10, 1981.

60

Marvin L. Wilenzik, Norristown, for appellants.

Edward F. Kane, Norristown, for appellee.

Before CERCONE, President Judge, and WATKINS and HOFFMAN, JJ.

CERCONE, President Judge:

This is an appeal from a final order of the court below vacating a preliminary injunction previously granted by the court and dismissing plaintiffs' complaint. This equity action was commenced by appellants Joel Straup, Preston Straup and Emerson Kriebel who sought injunctive relief enjoining the appellee, the Times Herald, from interfering with appellants' newspaper "distributorships." The events giving rise to this appeal are as follows.

In 1927, the appellant Emerson Kriebel purchased a newspaper "distributorship" from the appellee, the Times Herald, for $2,000.00. The distributorship involved a certain geographic area as well as the then existing customer list. Kriebel's "distributorship" gave him the right to act as the exclusive distributor of the Times Herald Newspaper in a specified geographic area. The term or duration of the distributorship was, according to Kriebel's testimony, for a lifetime. From 1927 to 1974, there was no written contract between the Times Herald and Kriebel.

Appellant Preston Straup purchased for $10,000 his exclusive "distributorship" in 1946 from William McLaughlin, himself a distributor who purchased the route from his predecessor, John Rockey. The purchase by Preston Straup was approved by the circulation manager of the Times Herald. On June 28, 1946, the "distributorship" became the subject of a written agreement between Straup and the Times Herald, which agreement provided for a one–year term and the right to terminate upon seven days notice. From that time until 1974, Straup worked without any written contract with the Times Herald.

Appellant, Joel Straup, purchased his Times Herald exclusive "distributorship" from Charles Childs in 1974 for $15,-000.00. This purchase was acknowledged and approved then by appellee's circulation manager, although no written contract between appellee and Joel Straup existed at that time.

Each of the three appellants was responsible for maintaining bookkeeping records for his route and each assumed responsibility for bad debts and risk of loss. Each appellant employed paperboys to deliver the newspapers in his area. Appellee controlled the retail price of the newspapers sold by appellants and also directed all promotional campaigns.

On January 16, 1974, appellants Kriebel and Preston Straup signed one year contracts with the Times Herald, each contract containing a seven day cancellation clause. On February 25, 1975, Joel Straup signed the same contract.

Beginning in October, 1974, appellants began to receive newspapers from appellee without the advertising sections inserted. Appellants then retained an attorney to negotiate a contract with the appellee with a view to increasing their compensation and obtaining an assumption by the defendant of the insertion of advertising circulars. No contract was ever executed. Finally, appellants' attorney notified the appellee that, beginning May 1, 1977, it must assume responsibility for the insertion of the circulars or the appellants would make no deliveries. When appellee refused to so agree, appellants refused to pick up the newspapers for delivery. Consequently, appellee immediately began to contract directly with many of the paper deliverers formerly used by appellants. The Times Herald thus began distributing its newspapers directly to its readers in the affected areas, a practice which conformed to the distribution method utilized by appellee for the balance of its circulation, appellants being the only remaining "dealers" of the Times Herald. This situation continued until May 9, 1977, when appellants commenced this litigation.

Appellants charge that the trial judge erred in not holding that appellants possessed exclusive distributorships which were to remain effective for so long as the holder satisfactorily delivered newspapers, in not holding that appellee is equitably estopped from terminating appellants' distributorships and, also, in not holding that appellee intentionally interfered with appellants' property rights.

As to the first of these assignments of error, the record does not bear out appellants' contention. "The general rule is that when a contract provides that one party shall render service to another, or shall act as his agent, or shall have exclusive sales rights within certain territory, but does not specify a definite time or prescribe conditions which shall determine the duration of the relation, the contract may be terminated by either party at will . . . (citations omitted). It is true that such a result does not follow in every instance, because it is the intention of the parties which is the ultimate guide, and, in order to ascertain that intention, the court may take into consideration the surrounding circumstances, the situation of the parties, the objects they apparently have in view and the nature of the subject matter of the agreement." *Lubrecht v. Laurel Stripping Co.*, 387 Pa. 393, 396, 127 A.2d 687, 689 (1956) quoting *Slonaker v. P. G. Publishing Co.*, 338 Pa. 292, 296, 13 A.2d 48, 50 (1940). See also *Bravman v. Bassett Furniture Industries, Inc.*, 552 F.2d 90, 92 (1977).

■ The appellants, plaintiffs below, had the burden of overcoming the presumption that any contract which may have existed between the parties was terminable at will. *Lubrecht*, supra. The necessary proof would involve a consideration of several factors including the circumstances surrounding the execution of the contract, the situation of the parties, the objects they apparently sought and the nature of the subject matter of the agreement. An evaluation of these factors would suggest whether the contractual relationship contemplated by the agreement was to endure for a reasonable time or for some particular period.

■ The "terminable at will" presumption may be rebutted not only by evidence showing a contrary understanding by the contracting parties, but also by showing that a plaintiff–agent gave a defendant principal consideration in addition to the agent's normal services. "It is the settled law of agency that if the agent or employee furnishes a consideration in addition to his mere services, he is deemed to have purchased the employment for at least a reasonable

period where the duration of the employment is not otherwise defined." *Cummings v. Kelling Nut Co.*, 368 Pa. 448, 451, 84 A.2d 323, 325 (1951) (quoting 4 Williston on Contracts (Rev.Ed.) § 1027–A at p. 2847 et seq.).

■ Appellants argue that the evidence supports their contention. Because all three appellants paid consideration for their distributorships, they assert the distributorships should be held to last for as long as the distributor, or his successor if he also paid consideration, satisfactorily performs his duties. They further argue that the express understanding between appellant Kriebel and appellee at the time he purchased his distributorship was that it was to last for as long as he satisfactorily performed his duties. By inference from appellee's course of conduct, appellants continue, a similar understanding existed between appellee and the original predecessors of appellant Straup. Thus, it seems, the distributorships would be perpetual so long as each successive distributor satisfactorily performs his duties. We disagree.

It is far from clear in this case whether the facts presented at trial established an intention of appellee and its original distributors, including appellant Kriebel and the Straups' predecessors, that the agreements they entered into would or could continue, in effect, forever, or even for a lifetime. No written contracts were executed when the distributorships were created. The only evidence on the issue of duration introduced to support the contention that the agreements of Kriebel and the predecessors of the Straups were to last a lifetime was the testimony of Kriebel himself that he understood his distributorship was to last a lifetime. The original predecessors of the Straups are unknown or dead. This is little evidence upon which to base so grand a contention as an irrevocable grant of an exclusive distributorship. The fact that appellants paid consideration for their distributorships is also not dispositive of the issue of the duration of the distributorships. Kriebel did pay $2,000 directly to the Times Herald for his distributorship, but that fact by itself does not give him that position for his

lifetime. The most that the payment of consideration guaranteed Kriebel was a distributorship for a reasonable time.

"If the principal received for his promise to employ the agent considerations other than a mere promise by the agent to serve, and no time is specified by the terms of the agreement, the principal's promise is interpreted as a promise to employ the agent for a time which is reasonable in view of the purposes of the party giving the considerations." *Cummings*, 368 Pa. at 456, 84 A.2d at 372 (quoting 4 Williston on Contracts) (Rev.Ed.) § 1027–A at p. 2847 et seq.).

Appellants Straup paid the consideration for their distributorships to their predecessors and not to the Times Herald. Even if their original predecessors paid consideration directly to the Times Herald, the predecessors would be subject to the same general rule of reasonable time period as Kriebel himself is subject.

The case of *Slonaker v. P. G. Publishing Co.*, 338 Pa. 292, 13 A.2d 48 (1940) bears much relevance for this case. In *Slonaker*, the plaintiff purchased a newspaper distributorship from another distributor of defendant's newspaper after consulting with defendant's circulation manager. The circulation manager encouraged the plaintiff and offered the newspaper's assistance should the plaintiff ever desire to resell. After working six years as a distributor, the plaintiff decided to sell, but defendant's circulation manager took the position that plaintiff had no right to sell. The defendant then began to distribute the newspaper in plaintiff's area through its own employees. The plaintiff sued alleging that his conversation with the circulation manager constituted a contract between plaintiff and defendant in which the defendant agreed to give plaintiff the exclusive right to distribute newspapers in the specified geographic area and to assist plaintiff if he desired to resell. Viewing the conversation between defendant's circulation manager and plaintiff as creating a contract, the Pennsylvania Supreme Court nonetheless affirmed judgment for the defendant. The court so held because it could not find that the defendant

gave any assurances regarding the length of time that the relationship would continue. The plaintiff had contended that the defendant was obligated to give him an exclusive agency for "as long as he cared to exercise it, even for life if he so desired." In this regard the court stated:

"It might be asked in this connection whether a resale would carry with it a similar measure of duration and so on in perpetuity to all future assignees, or whether the agency in the hands of a purchaser from plaintiff would be reducible, at the moment of purchase, to one terminable at will of defendant. . . . there was no suggestion that defendant would give to plaintiff, or to any purchaser from him, an irrevocable grant of the right to buy and distribute the Post–Gazette . . . To constitute a unilateral commitment of that magnitude there would be required language of far more precise and unmistakable character." Id., 338 Pa. at 295, 13 A.2d at 50.

The meager evidence presented concerning the terms of Kriebel's contract with the Times Herald fails to support his contention that his contract was to last for his lifetime. Regarding the Straups, there is no evidence that either of them ever had a contract with the Times Herald insuring them a lifetime distributorship. Instead, the evidence suggests that they both purchased from prior distributors and that neither had any direct conferences with anyone at the Times Herald regarding his working arrangement. Thus, the working arrangement that existed between appellants and the Times Herald would ordinarily be terminated at the will of either party.

Our analysis does not end here, however. In deciding the general question before us in the case, whether the lower court abused its discretion in denying permanent injunctive relief, we are led to the conclusion that the Times Herald unjustifiably terminated the working arrangement it had with appellants.

 Pennsylvania courts sitting in equity have jurisdiction to prevent the continuance of acts contrary to the law or prejudicial to the interest of individual rights. This

includes the authority to enjoin wrongful breaches of contract where money damages are an inadequate remedy. *Leveto v. National Fuel Gas Distrib. Corp.*, 243 Pa.Super. 510, 366 A.2d 270 (1976). However, a party seeking the injunction must establish that a clear legal right exists, not one that is doubtful or uncertain, *Locust Club v. Hotel and Club Emp. Union Local 568, AFL–CIO*, 397 Pa. 357, 155 A.2d 27 (1959), and that irreparable and permanent injury is threatened by a failure to grant relief. *School District of Pgh. v. Zebra*, 4 Pa.Cmwlth. 642, 287 A.2d 870, rev'd 449 Pa. 432, 296 A.2d 748, appeal after remand, 15 Pa.Cmwlth. 203, 325 A.2d 330 (1972). In the instant case, the lower court concluded that a clear and unmistakable right had not been proven by the plaintiffs–appellants concerning their relationship to the Times Herald. Our review of the law and evidence leads us to a different result. Furthermore, we are mindful of the concept that equity does not favor forfeiture, and that it has long been held that courts should hesitate to enforce a forfeiture. *Barraclough v. Atlantic Refining Co.*, 230 Pa.Super. 276, 326 A.2d 477 (1974). If the contract here was determined to be terminable at the newspaper's will, the result would indeed be comparable to a forfeiture in light of appellants' long term working relationship with the Times Herald, and their investments in the distributorships.

In arriving at its decision, the lower court failed to consider the broad function of courts which is to determine the intent of the parties as manifested by their dealings with each other and their business conduct throughout the years. Of course, the written agreements signed by appellants are one part of our determination of the intent of the parties and the scope of the agreement as they understood it. However, where no extension of a contract is negotiated, there is no basis for considering the expired contract as definitively governing the relationship of the parties. *Appeal of Cumberland Valley School District*, 31 Pa.Cmwlth. 407, 376 A.2d 674 (1977). The surrounding circumstances and subsequent acts of the parties are important to show intent. *Philadelphia Fresh Food Terminal Co. v. M. Levin &*

*Co.*, 239 Pa.Super. 287, 361 A.2d 886 (1976). The testimony presented in the instant case leads us to conclude that appellants proved they had a contractual relationship subject to the protection of the equity courts.

██ Appellants suggest that appellee was equitably estopped from terminating the exclusive distributorships possessed by the appellants because of the words, silence and conduct of appellee's employees. The doctrine of equitable estoppel is ordinarily advanced as a defense and as such must be raised in the pleadings under the New Matter heading. Failure to so plead the defense of equitable estoppel constitutes a waiver of that defense. Pa.R.Civ.P. 1030, 1032. Although the lower court addressed the merits of appellants' claim of equitable estoppel, it held initially that appellants had waived their right to raise that argument by failing to plead it specifically. The lower court said that the doctrine of equitable estoppel had not been pleaded, nor raised at previous hearings or arguments, nor mentioned in the three previous briefs filed by appellants and thus had been waived.

However, appellants raised this argument not as a defense but rather as the affirmative basis of their request for injunctive relief. The equitable estoppel doctrine is one of the antecedents of the modern doctrine of detrimental reliance or promissory estoppel. As Dean Murray states in his treatise:

"Normally, equitable estoppel referred to a situation in which a party made a false representation to, or knowingly concealed material facts from, another party with the intention that the innocent party should act upon the false representation or concealment. [However, courts often held the doctrine of equitable estoppel to apply even where no false representation or concealment of material facts existed.] The promise was enforceable because the promisee had altered [his] position to [his] detriment in the reasonable belief that the promise would be performed. The development making the promise enforceable is reliance, and the use of the estoppel concept may be laid to

the felt necessity to find a doctrine which would support the result the courts sought to reach." *Murray on Contracts*, pp. 90–91 (Rev.Ed.1974).

Whether the phrase "equitable estoppel" or the phrase "detrimental reliance" is used, the basic contention of the appellants is clear: Appellee ought not to be permitted to deny that through its representations to appellants it induced appellants to believe that certain facts existed, the existence of which facts the appellants relied upon in purchasing and operating their respective distributorships. The evidence presented by appellants demonstrates the actions and inactions of appellee upon which appellants rely in making their equitable estoppel argument. Because appellants did not use the labels "equitable estoppel" or "detrimental reliance" at some prior stage of the proceedings does not mean that they have waived their right to so frame the issue now.

■ The purpose of contract law may be stated as the fulfillment of expectations induced by the making of a promise. *Murray supra*, at p. 195. It is well established that a promise which induces detrimental reliance should be enforced. *Id.* at p. 196. The Restatement (Second) of Contracts § 90 (Tent. Draft No. 2, 1965) provides:

"Promise Reasonably Inducing Action or Forbearance. A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise. The remedy granted for breach may be limited as justice requires."

Comment a to this section states:

"This section is often referred to in terms of 'promissory estoppel,' a phrase suggesting an extension of the doctrine of estoppel. Estoppel prevents a person from showing the truth contrary to a representation of fact made by him after another has relied on the representation. See Rest. Agency, 2d § 8B, Rest. Torts 2d §§ 872, 894." Restatement (Second) of Contracts § 90, comment a (Tent. Draft No. 2, 1965).

 Equitable estoppel arises when a party by acts or representation intentionally or through culpable negligence, induces another to believe that certain facts exist and the other justifiably relies and acts upon such belief, so that the latter will be prejudiced if the former is permitted to deny the existence of such facts. *Board of Educ. of School Dist. of Phila. v. Philadelphia Fed'n of Teachers Local No. 3, AFT, AFL–CIO*, 40 Pa.Cmwlth. 490, 397 A.2d 1273 (1979); *Northwestern Nat'l Bank v. Commonwealth*, 345 Pa. 192, 27 A.2d 20 (1942). Reduced to its essence, equitable estoppel is a doctrine of fundamental fairness intended to preclude a party from depriving another of a reasonable expectation, when the party inducing the expectation knew or should have known that the other would rely to his detriment upon that conduct. *Commonwealth ex rel. Gonzalez v. Andreas*, 245 Pa.Super. 307, 369 A.2d 416 (1976). Estoppel is essentially a flexible doctrine, to be applied or denied as the equities between the parties preponderate. *Matter of Reading, Co.*, 404 F.Supp. 1249 (1975). Thus, the doctrine of equitable estoppel is used to protect the reasonable expectations of the party who relies on another's course of conduct to the former's detriment in order to insure fundamentally fair dealing.

 The essential elements of estoppel are:
"(1) Misleading words, conduct or silence by the party against whom the estoppel is asserted, (2) unambiguous proof of reasonable reliance on the misrepresentation by the party seeking to assert the estoppel, and (3) no duty of inquiry on the party seeking to assert estoppel." *Stolarick v. Stolarick*, 241 Pa.Super. 498, 509, 363 A.2d 793, 799 (1976).

 In the instant case, the Times Herald engaged in a course of conduct in which its dealers were treated as owners of exclusive newspaper distributorships covering specified geographical areas. The newspaper had knowledge of the fact that consideration passed for the purchase of the distributorships, and the newspaper was silent in the face of that knowledge. Appellants operated their distribu-

torships without interference or questions from the newspaper. The newspaper did not attempt to unilaterally discharge any dealer or otherwise cancel his dealership. Instead, when the Times Herald became dissatisfied with appellant Kriebel's performance, Kriebel received letters urging him to dispose of his "business" and requesting that he try to find a new "buyer." On another occasion, the Times Herald referred to Joel Straup in an article which it published as the new "franchise dealer" and "dealer distributor" for his area. Even the contracts which the Times Herald asked appellants to sign in 1946 and 1974 were never enforced and were permitted to expire.

Thus, the Times Herald represented by its words, silence and conduct that appellants were the owners of property which they could sell for value, and not merely parties to daily contracts terminable at will. In approving the Straups as new purchasers of distributorships, the Times Herald never indicated to the purchasers that they were buying a contract terminable at will. Instead, they ratified appellants Straups' expectations that they were buying something more than a contract terminable at will. And, in its direct dealing with appellant Kriebel, the newspaper referred to him as an owner who could sell his property, the distributorship, at any time. The appellants relied to their detriment on the representations of the newspaper when they purchased the distributorships and expended their time and efforts in making the distributorships successful. Because of appellants' detrimental reliance, the newspaper is now estopped from claiming that there is no ongoing contractual relationship between it and the three appellants.

From this we conclude appellants have proved clear contractual relationships with the newspaper which established a kind of conditional property right in the distributorships that cannot be terminated at will. There is no evidence that appellants' failure to assume a new duty and insert the advertising circulars was a breach of their contracts with the newspaper warranting a termination of the contract for cause. Thus, failure to grant the requested injunctive relief

created irreparable and permanent injury to appellants who were deprived of their contractual rights. The lower court is found to have abused its discretion in denying injunctive relief.

Having determined that a contract exists there remains the complex problem of determining the rights and duties created by the contract. Although appellee is estopped from depriving appellants of their reasonable expectations that they "owned" their respective distributorships, the questions remain how and when the distributorship system may be ended by the Times Herald. It is not reasonable that the distributorships should last forever if the Times Herald no longer wants to use such a system. The problem of determining the terms of the contract is:

> "only in part a problem of determining the manifested intentions of the parties, a process which is rightly called interpretation. To a large extent, it also involves the problem of providing for contingencies that have arisen in the course of performance which were not contemplated, and consequently were not provided for at all, at the time the contract was formed. In involves providing for certain details of performance left unspecified by the parties, either consciously or unconsciously." *Murray on Contracts*, supra, at p. 223.

In our determination of the terms of the instant contract we are mindful that the remedy granted should be limited as justice requires. Restatement (Second) of Contracts § 90 (Tent. Draft No. 2, 1965). We also recognize that we are providing for a contingency not contemplated or discussed by the parties to this contract. It can be said that we are judicially creating terms of a contract. Nonetheless, such construction, we believe, is fair, reasonable and, indeed, necessary under the circumstances of this case. Any distributorship may be ended by the Times Herald when it can demonstrate that the owner no longer functions effectively, that the owner no longer meets its standards of employability or that the owner is otherwise providing deficient service to its customers. If the distributors maintain the newspa-

per's work standards, the Times Herald can nonetheless end the distributorships if it so desires by buying out the appellants' interests at fair market value. If there is a dispute as to fair market value, it may be judicially resolved. See 1 *Corbin on Contracts*, § 98 (1963); *Murray on Contracts, supra*, at p. 50. This appears to us an equitable way to protect appellants, who will otherwise be prejudiced by their reliance upon the newspaper's course of conduct, while insuring that the newspaper maintains ultimate control over its methods of doing business.

Accordingly, the order of the lower court is reversed and the case is remanded for the entering of an injunction. Such injunction shall preserve the relationship between the parties until one of the aforementioned contingencies regarding termination of the distributorships shall become operative.

HOFFMAN, J., concurs in the result.