Francis J. McCARTHY

v.

**ARNOLD FOODS COMPANY, INC. and Best Foods Baking Group, a division of CPC International, Inc. and CPC International, Inc.**

Civ. A. No. 89–4504.

United States District Court,
E.D. Pennsylvania.

July 7, 1989.

Catherine Ann Porter, Langhorne, Pa., for plaintiff.

Raymond T. Cullen, Philadelphia, Pa., for defendants.

OPINION AND ORDER

VAN ANTWERPEN, District Judge.

This matter comes before the court upon the motion of the plaintiff, Francis J. McCarthy, for a preliminary injunction against the proposed termination of his wholesalership by Best Foods Baking Group, a division of CPC International, Inc., which includes Arnold Foods Company, Inc. A hearing and oral argument was held on this motion in Easton, Pennsylvania, on June 23, 1989. Pursuant to Fed.R. Civ.P. 52(a), we make the findings of fact and conclusions of law set forth below.

FINDINGS OF FACT

1. The plaintiff, Francis J. McCarthy, is a resident of Pennsylvania. In 1975, he purchased an Arnold Foods Company, Inc. ("Arnold") wholesalership from another Arnold wholesaler for $175,000. He currently owes $18,000 out of that sum. Mr. McCarthy is presently sixty-four years of age and has completed high school to the tenth grade. In 1981, he suffered a stroke which left him in poor health and unable to drive.

2. In his wholesalership, Mr. McCarthy buys bread and baked goods from defendant Arnold on consignment. He stores these goods in a warehouse from which he distributes them to individual distributorships, who are also known as "routemen". These distributors then deliver the goods to retail outlets like supermarkets, where the goods are available to the consumer. The area serviced by this wholesalership is comprised of suburban counties outside Philadelphia, Pennsylvania. Gross yearly profits are estimated to be around $98,000 to $100,000.

3. Mr. McCarthy earns approximately $32,000 a year from the business. He permanently employs his wife, Claire B. McCarthy, aged sixty-two, and his son, Craig F. McCarthy, aged thirty-five, in his wholesalership. Mrs. McCarthy takes care of the paperwork for the business at a salary of $250 a week for a total of approximately $12,500 to $13,000 a year. Craig assists his father in running the wholesalership and earns $35,000 a year. Craig has been assisting his father since 1975. Prior to that, he had earned an Associate's Degree and had taken further college credits. He also had other business experience, including an Arnold's distributorship for fifteen months. Craig was planning to take over the wholesalership when his father retired or died. If the wholesalership is terminated, however, he has been offered a job as a distributor with Arnold at $23,800 a year, subject to his passing a physical examination.

4. The McCarthy wholesalership deals practically exclusively in Arnold baked products. A small ($3,000 a year) amount of money was also made from Craig's sales of Dutch Mill Baking Company donuts.

5. Craig testified that he spends approximately three to five minutes a piece, with each of his Arnold distributors each day.

6. Since 1984, plaintiff McCarthy has subleased the warehouse he uses from the defendant Arnold who leases it directly from the landlord. This sub-lease was not introduced into evidence at the hearing but is before the court by stipulation of counsel. Mr. McCarthy pays $650 a month in rent and has overhead expenses, such as telephone, electric and water bills. These aggregate approximately $150 to $200 each month. Other additional costs are $25 a week for gas for the business' trucks plus other monies for insurance on those vehicles. These expenses come to another $5,000 to $8,000 a year.

7. In the past, Mr. McCarthy also purchased a spare truck, and a coffee machine and bulletin board for the routemen.

8. Craig testified that, at the time his father took over the wholesalership in 1975, the business was purchasing around $17,000 worth of merchandise a week. Currently, it is buying almost $40,000 worth of merchandise a week. Craig acknowledged, however, that his sales figures made no adjustment for inflation.

9. Craig stated that plaintiff's Exhibit 1, a copy of the Wholesaler's Agreement, was the agreement under which his father and the defendant had been operating. (The exhibit was an unsigned copy of the Wholesaler's Agreement).

10. In late 1986, defendant CPC International, Inc. ("CPC") acquired defendant Arnold. Best Foods Baking Group is only a division of CPC; it is not a corporation. Plaintiff's counsel concedes this and agrees that Best Foods Baking Group is not a proper party to this suit.

11. As part of a reorganization plan, after its acquisition of Arnold, CPC, in 1987, decided to eliminate the middle-level of wholesalerships and to deal directly with the distributors as a professional sales force.

12. As part of the implementation of this reorganization plan, Kenneth Traenkle, Division Sales Manager of Best Foods Baking Group of CPC, sent a letter, dated March 20, 1989 to Mr. McCarthy informing him of the company's decision to terminate his wholesalership, effective ninety days from March 20, 1989. In another letter from Mr. Traenkle to Mr. McCarthy, also dated March 20, 1989, Mr. Traenkle, on behalf of Arnold, offered McCarthy $325,-000 for his wholesalership. On April 25, 1989, Margaret L. Sanner, an attorney with Morgan, Lewis & Bockius, the law firm representing Best Foods Baking Group and CPC, sent a letter to Mr. McCarthy advising him that her client would not renew the sublease on the warehouse which expired on May 31, 1989. Her client did, however, agree to extend the terms of the sublease, on a day-to-day basis, from June 1, 1989 through June 18, 1989 to coincide with the termination of the plaintiff's wholesalership.

13. Mr. McCarthy rejected the offer of $325,000 and counter-offered for $1,000,-

000. He is the last wholesaler in this phase of the reorganization to be bought out.

14. Thomas Echsner, a Vice–President of Sales with the Best Foods Baking Group of CPC, testified that the decision to terminate the wholesalerships was made so that the company could develop the distributors as a professional sales force. The bread industry, he said, is a highly competitive one and most of the competition is on the retail store level. Competition is against various national brands like Pepperidge Farm and Wonder Bread, as well as store, in-house brands. Dealing directly with the distributors, he explained, means a better ability to train and to develop them so as to increase contact with store managers and sales to the stores. Continuous training is vital because the bread business constantly changes.

15. Mr. Echsner explained that if some company-owned wholesalerships had higher "stale rates" than the plaintiff's that could be accounted for by a "push" to be sure that there were ample products on the shelves and that no sales were missed.

16. Mr. Traenkle, Division Manager of Best Foods Baking Group, testified that the plaintiff hindered his managers from talking with the distributors. He also said that not all of plaintiff's distributors were using their "route books" which he described as a basic tool of the industry. This book is used to keep track of sales, "stales", and individual accounts. He also testified that, to the best of his knowledge, the defendant is, today, the only baking company left with a middle-tier of distribution.

17. Mr. Traenkle testified as to the intensity of competition in his industry. He considered on-going training a necessity, since mistakes are costly in a business with a highly perishable product like bread.

18. Mr. Traenkle also testified that the warehouse used currently by the plaintiff is not large enough to meet the company's anticipated needs. The company wants a larger facility with better access to major highways. More routes and more men will come out of one place. He further stated that there were times when the distributors were discouraged by the plaintiff from coming to company training sessions. These sessions were held to keep the men current with changes in the business. District managers were also to get on the truck with a man and train him from start to finish, at least twice a month.

19. According to Mr. Traenkle, no store had called him regarding inadequate deliveries from the plaintiff. No distributors had complained, but district managers had. At times, his managers had been refused access to the plaintiff's terminal grounds.

20. Mr. Traenkle said that, although the plaintiff's "stale" rate had gone up last year, he still had one of the lowest "stale" rates in the area. He also testified that in the past month they had begun to achieve some "excellent results" in lowering the "stale" rates in two of the wholesalerships taken over in plaintiff's region in late 1988 and early 1989. He said that the decision the company had made to own its own wholesalerships was one made for the long and not for the short term.

21. Mr. Traenkle stated that about a year ago the plaintiff had offered his business for sale to the defendant for $750,000 to $800,000. Nothing further came from that offer.

22. A Wholesaler's Agreement, dated September 3, 1975, exists between Mr. McCarthy and Arnold Bakers, Inc. Clause 13 reads:

> So long as the BAKERY shall continue in business, it shall not terminate or cancel this Agreement, provided the WHOLESALER faithfully carries out the terms hereof. This Agreement shall continue in full force and effect until cancelled by the BAKERY for just cause or until terminated by the WHOLESALER with or without just cause.

23. This Wholesaler's Agreement contains the words "Franchise Territory" in several paragraphs (paragraphs ## 1, 3, 5, 8, 9, and 14) and the words "franchise fees" in paragraph 14. Arnold agrees to deliver consigned baked goods each baking day to the wholesaler. The main duty of the wholesaler is to distribute Arnold

baked goods to the distributors. How payment is to be made and stale items returned is also mentioned. The territory to be served is also described in an attachment.

CONCLUSIONS OF LAW

1. The court has jurisdiction over this matter pursuant to 28 U.S.C.A. § 1332(a) (West Supp.1989).

■ 2. Neither party has argued the issue of choice of law before the court. Both parties, however, have included in their briefs Pennsylvania court cases to support their arguments. We agree that Pennsylvania law is the law to be applied in this dispute over the termination of the plaintiff's wholesalership.

3. Under *Klaxon Co. v. Stentor Electric Manufacturing Co., Inc.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941), a federal court, sitting in diversity, must apply the conflict of laws rules prevailing in the state in which it sits. We, therefore, must turn to Pennsylvania's conflict of laws rules for contract cases in order to decide which state's law applies in the instant case.

4. As the Third Circuit has explained, Pennsylvania's "flexible conflicts methodology" applies to contract actions as well as tort actions:

> In *Melville v. American Home Assurance Co.*, 584 F.2d 1306, 1311–1313 (3d Cir.1978), this court determined that the 'flexible conflicts methodology' combining interest analysis and Restatement Second of Conflicts of Laws contacts theory employed by the Pennsylvania Supreme Court in the tort case of *Griffith v. United Air Lines, Inc.*, 416 Pa. 1, 203 A.2d 796 (1964), is to be extended to contracts actions. Thus, under Pennsylvania choice-of-law principles, the place having the most interest in the problem and which is the most intimately concerned with the outcome is the forum whose law should be applied. *Griffith*, 416 Pa. at 22, 203 A.2d at 805–806.

*Complaint of Bankers Trust Co.*, 752 F.2d 874, 881–82 (3d Cir.1984).

Therefore, we must now decide which state has the most "contacts" and which state is most intimately concerned with the outcome.

5. In an action for breach of contract, the governing choice of law rule in Pennsylvania dictates that the following "contacts" be considered in determining the proper choice of law: the places of negotiation, contracting, and performance, the location of the subject matter of the contract, and the citizenship of the parties. *Day & Zimmerman, Inc. v. Exportadora Salcedo de Elaboradoros de Cacao S.A.*, 549 F.Supp. 383 (E.D.Pa.1982).

6. In the instant case, the record is silent as to the places of negotiating and contracting. The place of performance is clearly Pennsylvania as is the location of the subject matter of the contract. Mr. McCarthy is also a citizen of Pennsylvania. Pennsylvania would also have the most interest in the problem and would be the most intimately concerned with the outcome of the instant case since this dispute concerns a Pennsylvania resident's business enterprise that supplies Pennsylvania stores with bread products for Pennsylvania consumers. We, therefore, believe that Pennsylvania law is indeed the proper choice.

7. In order to grant a preliminary injunction, the court must find that the moving party has shown the following factors: (1) a reasonable probability of eventual success in the litigation and (2) irreparable injury *pendente lite* if relief is not granted. The court should also take into account, when they are relevant, (3) the possibility of harm to other interested persons from the grant or denial of the injunction and (4) the public interest. *In re Arthur Treacher's Franchisee Litigation*, 689 F.2d 1137, 1143 (3d Cir.1982).

8. In this Circuit, a preliminary injunction must be denied, unless the moving party can demonstrate *both* a likelihood of success on the merits and the probability of irreparable harm if relief is not granted. *Morton v. Beyer*, 822 F.2d 364, 367 (3d Cir.1987).

9. Of "irreparable harm", the Third Circuit has written:

> [T]he requisite feared injury or harm must be irreparable—not merely serious or substantial. " 'The word means that which cannot be repaired, retrieved, put down again, atoned for ... grass that is cut down cannot be made to grow again; but the injury can be adequately atoned for in money. The result of the cases fixes this to be the rule: the injury must be of a peculiar nature, so that compensation in money cannot atone for it....' *Gause v. Perkins,* 3 Jones Eq. 177, 69 Am.Dec. 728 (1857). 'Irreparable injury is suffered where monetary damages are difficult to ascertain or are inadequate.' *Danielson v. Local 275, Laborers Union,* 479 F.2d 1033, 1037 (2d Cir.1973)."

*In re Arthur Treacher's Franchisee Litigation,* 689 F.2d at 1146 (quoting *A.O. Smith Corp. v. F.T.C.,* 530 F.2d 515, 525 (3d Cir.1976)).

10. Other jurisdictions, most notably the Second Circuit Court of Appeals, have recognized irreparable harm in the termination of a long-standing business relationship and have granted injunctive relief. *See Roso–Lino Beverage Distributors, Inc. v. Coca–Cola Bottling Co.,* 749 F.2d 124 (2d Cir.1984) (eleven-year old distributorship run by husband and wife terminated) and *Semmes Motors, Inc. v. Ford Motor Co.,* 429 F.2d 1197 (2d Cir.1970) (twenty-year old dealership run by father, into which son had recently entered, terminated).

11. We are aware of two cases handed down by courts within the Third Circuit's jurisdiction that have cited to *Semmes,* 429 F.2d 1197, for the proposition that termination of a long-standing employment or business relationship can result in irreparable harm. In *Carlo C. Gelardi Corp. v. Miller Brewing Co.,* 421 F.Supp. 233 (D.N.J.1976), the District Court for the District of New Jersey found irreparable harm in the termination of the plaintiff's beer distributorship and cited to *Semmes,* 429 F.2d 1197, among other authority, in support of that finding. In *Goldhaber v. Foley,* 519 F.Supp. 466 (E.D.Pa.1981), court reporters who were to be replaced by a court reporting service requested a preliminary injunction to help them retain their jobs. Said the court in *Goldhaber,* 519 F.Supp. at 475: "To remove them [the court reporters] from their established careers and force them to seek new employment would constitute irreparable injury, even assuming that they had available a cause of action for damages which would recompense them for any pecuniary loss." The *Goldhaber* court, in a footnote, then cited immediately to Judge Friendly's words in *Semmes,* 429 F.2d at 1205: "[T]he right to continue a business in which William Semmes had engaged for twenty years and into which his son had recently entered is not measurable entirely in monetary terms."

12. We also note that *Semmes,* 429 F.2d at 1205, in support of its finding that the termination of a twenty-year old auto dealership constituted irreparable harm, cited to Judge Goodrich of the Third Circuit: "As Judge Goodrich said a 'judgment for damages acquired years after his franchise has been taken away and his business obliterated is small consolation to one who, as here, has had a Ford franchise' for many years, *Bateman v. Ford Motor Co.,* 302 F.2d 63, 66 (3 Cir.1962)."

13. Since *Semmes,* 429 F.2d 1197, cites to Third Circuit authority on the subject of business termination and the possible inadequacy of monetary damages, and since *Semmes* itself has achieved some favorable citation in this Circuit on the District Court level, the plaintiff can successfully argue "irreparable harm" in the termination of his fourteen-year old wholesalership.

14. The plaintiff argues that his wholesalership falls into the category of a "franchise" and that, as such, its termination is subject to the "good faith" and "commercial reasonableness" standards found in *Atlantic Richfield Co. v. Razumic,* 480 Pa. 366, 390 A.2d 736 (1978) and its progeny.

15. A "franchise" has been defined, in Pennsylvania case law, as follows:

> In its simplest terms, a franchise is a license from the owner of a trademark or trade name permitting another to sell a product or service under the name or

mark. More broadly stated, the franchise has evolved into an elaborate agreement by which the franchisee undertakes to conduct a business or sell a product or service in accordance with methods and procedures prescribed by the franchisor, and the franchiser undertakes to assist the franchisee through advertising, promotion and other advisory services. The franchise may encompass an exclusive right to sell the product in a specified territory. *See* 15 Business Organizations, Glickman, Franchising § 2.01.

*Piercing Pagoda, Inc. v. Hoffner*, 465 Pa. 500, 351 A.2d 207, 211 (1976).

16. In the case at bar, an unsigned copy of the Wholesaler's Agreement was introduced into evidence. Craig F. McCarthy, however, testified, upon being presented with this document at the hearing, that this was the agreement under which his father and the defendant Arnold had operated. For the purposes of this opinion, we find that the relationship between the parties was as reflected in the Wholesaler's Agreement.

17. In the Wholesaler's Agreement, the phrase "franchise territory" is used several times and the term "franchise fees" is used once. There is no indication, however, as to what that fee is or to whom it is paid. The plaintiff has received authority to sell Arnold trade name bread products in a specific territory. Methods and procedures are, in a sense, laid down by Arnold for the return of stale items and the ordering of bread products but for little else. Arnold offers no assistance with advertising, promotion or advisory services.

18. Distributing franchiseships are the most difficult franchiseships to define "since they are similar, if not indistinguishable, from traditional sales distributorships." Annot., 59 A.L.R.3d 244, 249 (1974).

19. In the case at bar, we believe that it makes little difference whether we define the Wholesaler's Agreement as a "franchise" or as a traditional sales distributorship, since we find that termination was properly exercised by the defendant under either categorization.

20. Where a franchise agreement makes no provision for termination or non-renewal of a franchise agreement without cause, the franchisor cannot arbitrarily sever its franchise relationship, but must do so only in good faith and in a commercially reasonable manner. *Razumic,* 390 A.2d at 742.

21. " '[T]he duty of good faith and commercial reasonableness is used to define the franchisor's power to terminate the franchise only when it is not explicitly described in the parties' written agreements.' [*Amoco Oil Co. v. Burns* ], 268 Pa.Super. 390, 408 A.2d [521] at 524 [1979]" *Amoco Oil Co. v. Burns,* 496 Pa. 336, 437 A.2d 381, 384 (1981).

22. In the instant case, paragraph 13 of the Wholesaler's Agreement permits Arnold to cancel the agreement for "just cause". "Just cause" is not defined in the agreement.

23. "Good faith" in the context of the termination of a franchise has been defined as "honesty in fact in the conduct or transaction concerned." *Loos & Dilworth v. Quaker State Oil Refining Corp.,* 347 Pa. Super. 477, 500 A.2d 1155, 1161 (1985) (adopting the definition contained in 13 Pa. Cons. Stat.Ann. § 1201 (Purdon 1984)). The plaintiff in the instant case has introduced no evidence that would show that the defendant acted in bad faith. The defendant offered evidence that the decision to terminate the middle-level of distribution had been made only after a serious study and that the wholesalers who had been terminated had been paid for the value of their businesses. The "good faith" of the defendant is evident.

24. We also find that the defendant observed the requirement of "commercial reasonableness". Every business must meet the changes which develop in the commercial climate of the time. There was testimony that the defendant is the last baking company to use a middle-tier system of distribution. There was also testimony as to the continuous change in the baking business and the intense competition. The

defendant's decision to train distributors as a professional sales force who could aggressively market the defendant's products with individual store managers in lieu of relying on the old middle-level system of distribution was a commercially reasonable one. Thus, if the plaintiff's enterprise be considered a franchise, it was properly terminated under *Razumic*.

25. If the plaintiff's enterprise be considered a traditional sales distributorship, the termination of that relationship was proper also.

26. "The general rule is that when a contract provides that one party shall render service to another, or shall act as his agent, or shall have exclusive sales rights within a certain territory, but does not specify a definite time or prescribe conditions which shall determine the duration of the relation, the contract may be terminated by either party at will ... (citations omitted)." *Slonaker v. P.G. Publishing Co.*, 338 Pa. 292, 296, 13 A.2d 48, 50 (1940).

27. In the instant case, the Wholesaler's Agreement is not terminable at will, since there are conditions prescribed which determine the duration of the relationship. Paragraph 13 allows the relationship to continue until various events occur, one of which is the termination of the agreement by the defendant for "just cause".

28. A business decision prompted by considerations of a franchise's unprofitability may constitute "reasonable and just" cause. *Burns*, 437 A.2d 381 (construing that phrase in the context of Pennsylvania's Gasoline Act, Pa.Stat.Ann. tit. 73, §§ 202–1 *et seq.* (Purdon Supp.1989)).

29. In the case at bar, the defendant wishes to meet the intense competition of the baking industry by streamlining its operations to create a distributor-sales force that will improve the delivery of fresh products and increase sales. We believe that this objective constitutes an equally "just cause" for termination of the middle layer of distribution.

30. Since under either a franchise or a sales distribution contract, the plaintiff's termination was done in "good faith" and in a "commercially reasonable manner",

and for "just cause", the plaintiff cannot show that he has a substantial likelihood of prevailing on the merits. Since he has failed to meet this burden, his request for a preliminary injunction must be denied.

31. In further support of this conclusion, we also find that the plaintiff has not met requirements 3 or 4 of the criteria for a preliminary injunction. The only persons whom the plaintiff has argued would possibly be harmed from the denial of this injunction are—in addition to Mr. McCarthy —Mrs. McCarthy and Craig. Craig, however, testified that he does have another job with Arnold awaiting him, albeit at a lower salary. The defendant is the employer of more than the three members of the McCarthy family, however. As a large baking business with products sold in many states, it employs numerous people. The continued viability of the company depends upon its ability to change with the times and to meet competition. The plaintiff obviously presents a sympathetic situation; however, we could anticipate harm to many more employees than just the McCarthy wholesalership if the defendant's failure to streamline operations led to a loss of market. We also believe that the public interest has always been served by as much competition as possible in the marketplace.

32. We have already explained the bases for our decision not to grant an injunction in the instant case. (See Conclusions of Law # # 30 and 31 above.) But, we might also add that *Straup v. The Times Herald*, 283 Pa.Super. 58, 423 A.2d 713 (1980), while distinguishable from the instant case in that *Straup* involved no "just cause" termination provision in a contract, is worthy of brief notice for its approach to the issue before it: termination of a contractual relationship not terminable at will. Recognizing that "it is not reasonable that the [newspaper] distributorships should last forever if the Times Herald no longer wants to use such a system" and that there should be some way to insure "that the newspaper maintains ultimate control over its methods of doing business", *Id.*, 423 A.2d at 721, the court proposed that one valid way for the newspaper to sever its

relationship with the dealers was by the newspaper's buying out the dealer's interests at fair market value. Any dispute over fair market value, the court said, could be judicially resolved. *Straup* encourages us in our view that valid business reasons, such as an honest desire to change a past way of doing business, can form a legitimate basis for termination.

33. Since we find that the plaintiff has failed to meet three out of four requirements for a preliminary injunction, the plaintiff's motion shall be denied. If agreement cannot be reached by the parties as to fair market value for the wholesalership, the plaintiff may pursue appropriate remedies at law.