747 A.2d 358

Edward A. KREUTZER; Charles R. Reinecker, Jr., and Kathy S. Reinecker, his wife, i/t/d/b/a Broughton News; Ernest W. Stephan; Thomas Wagner and Joan M. Wagner, his wife; John J. Delaney, Jr.; Alvar R. Erlandson and Lois J. Erlandson, his wife; Robert Brayer and Mariann Brayer, his wife; Daniel Bulford, Linda A. Bulford, his wife, Gregory Koenig, Kevin Walsh and Nancy Walsh, his wife, a partnership, t/d/b/a Brookline News; Michael Pendel and Susan Ieraci Pendel, his wife; Jerry M. Richard; Martin S. Feldman; Gregory Galandoo and Brenda Galandoo, his wife; David Paul Koenig; Gregory G. Koenig and Gina Bianco Koenig, his wife; James W. Schiedenhelm, Karen Schiedenhelm, his wife, and Pleasant Hills New, Inc., a Pennsylvania Corporation; Kenneth Walker Stephan; Suzanne M. Richard; Michael Ventrone and Frances M. Ventrone, his wife; John David O'Donnell; William W. Wills, Jr., and Virginia C. Wills, his wife; Richard J. McKenna, Sr., Carla A. McKenna, his wife; Paul V. McKenna, II and Margaret McKenna, his wife, Appellees,

v.

MONTEREY COUNTY HERALD COMPANY, f/k/a Pittsburgh Press Company, Appellant.

Supreme Court of Pennsylvania.

Argued Sept. 15, 1999.

Decided March 22, 2000.

John A. McCreary, Jr., Latrobe, Ernest E. Vargo, Cleveland, OH, for Monterey County Herald.

Brian P. Gottlieb, Harrisburg, for Amicus-PA Newspaper Assoc.

Richard B. Tucker, III, Gary P. Hunt, Thomas A. Shumaker, Pittsburgh, for Kreutzer, Reinecker, etc.

W. Thomas McGough, Jr., Debra H. Dermody, Pittsburgh, Donna M. Maus, for Post Gazette.

Before FLAHERTY, C.J., and ZAPPALA, CAPPY, CASTILLE, NIGRO, NEWMAN and SAYLOR, JJ.

### OPINION OF THE COURT

FLAHERTY, Chief Justice.

The issue in this case is whether written contracts which allow either party to terminate the contract at will are subject to a claim of equitable estoppel, the essence of which is that the words or conduct of the terminating party preclude that party from using the written contract to deny the other party's claim of detrimental reliance and damages.

In 1996, appellees, former distributors of *The Pittsburgh Press* newspaper, sued the Monterey County Herald Company, formerly *The Pittsburgh Press,* for breach of contract, estoppel, unjust enrichment, and misappropriation of trade secrets, after *The Press* went out of business following a labor dispute and appellees were no longer able to operate their businesses distributing *The Press.*

All of the appellees acquired their distributorships from third parties who had previously contracted with *The Press* to distribute newspapers. The appellees assert that they paid consideration in various amounts to the former distributors in order to take over the former distributors' businesses. No appellee paid anything to *The Press* to distribute papers; however, all of the appellees had an agreement with *The Press* that they would purchase newspapers from *The Press* at wholesale and distribute the papers to the newspaper's customers, charging the customers the retail price.

Fifteen of the distributor-appellees entered into written distribution agreements with *The Press* which provided that the distributors would buy the newspapers from *The Press* and deliver the newspaper at retail rates to home-delivery subscribers and others. The remaining six former distribu-

tors purchased and delivered newspapers from *The Press* pursuant to verbal agreements.

The written distribution agreements were terminable at will by either party upon thirty day's notice:

> This Agreement ... shall remain in effect from month to month ... unless and until terminated by the Seller giving the Buyer ... at least thirty (30) days written notice of its desire and intention to terminate this Agreement, or by the Buyer ... giving the Seller not less than thirty (30) days written notice of his or their desire and intention to terminate this Agreement.

The essence of the appellees' claim is that although there was no express promise to compensate appellees should *The Press* discontinue business, and although there was no express promise that *The Press* would stay in business for a certain period of time, and although the written distribution agreement was terminable at will, *The Press* was, nonetheless liable to the former distributors for their damages when *The Press* ceased business because *The Press* behaved in ways that led the distributors to believe that *The Press* either would remain in business longer than it did or that it would pay them for their distributorships if it went out of business. The appellees attach particular significance to the fact that *The Press* was aware that distributorships were sold and that *The Press* approved new distributors when a sale of a distributorship was contemplated.[1]

The trial court sustained *The Press*'s preliminary objections in the nature of a demurrer as to the contract claim on the grounds that under Pennsylvania law a distribution agreement is terminable at will unless otherwise agreed. The court also sustained preliminary objections in the nature of a demurrer as to the estoppel claim on the grounds that none of the promises and activities of *The Press* alleged in the complaint

---

1. When distributorships were sold, *The Press* furnished assurances to prospective new distributors that it would enter into a distribution agreement with them. Thus, the Press approved the sale of distributorships in the sense that it agreed to deal with the purchaser as a new distributor.

would have created any reasonable expectation on the part of distributors that *The Press* could not exercise its right to terminate the distribution agreement.

Superior Court reversed. It agreed with the trial court that the contract claims were properly dismissed, but it determined that the estoppel claim should not have been dismissed. Superior Court's estoppel analysis was based largely on *Straup v. Times Herald,* 283 Pa.Super. 58, 423 A.2d 713 (1980). In that case, when newspaper distributors began receiving newspapers without the advertising sections inserted, they attempted to negotiate a change in the way the advertising sections were handled, and when this failed, they announced that they would not distribute the newspapers unless the advertising sections were already inserted. The newspaper refused to agree, and the dealers then refused to pick up the newspapers. The newspaper then began distributing its papers itself, thus removing the distributors from their accustomed duties. At the time the *Straup* action commenced, all written agreements between the parties had expired. Although the *Straup* court acknowledged that the oral contracts pursuant to which the parties operated were presumably terminable at will, it held that the newspaper's words and conduct established a kind of conditional property right which could not be terminated at will. Superior Court held that because the newspaper treated dealers as "exclusive owners" of distributorships and remained silent when distributorships were sold for consideration, the newspaper was "estopped from depriving appellants of their reasonable expectations that they 'owned' their respective distributorships." The holding, therefore, was based on the theory of equitable estoppel.

The concept of equitable estoppel originated in the fourteenth century:

> Historically speaking equity validated and enforced promises predicated on what we now label "promissory estoppel" centuries before bargained-for consideration was conceived. What is presently referred to as "equity" originated in 1349, when Edward III by a general writ referred all matters as were within the king's divine "prerogative of Grace" to the

Chancellor for adjudication. This general authority (pre-rogative of Grace) required the Chancellor to base all decisions on the principles of "Conscience, Good Faith, Honesty and Equity." If someone had committed any unconscientious act or breach of faith and the "rigour of the law" favored that party, then the other party who suffered thereby would be granted corrective relief "under the head of conscience." With its source in that writ, the "Good Faith" basis of promissory estoppel was subsequently recognized and applied by American courts.

Based on good faith and conscience, Chancery, during the fourteenth and fifteenth centuries, applied the four principles (which are commingled and now referred to as "equity") and gave "promissory estoppel" relief to plaintiffs who had incurred detriment on the faith of a defendant's promise.

III Corbin on Contracts, Section 8.11, (1996) (footnotes omitted).

Mr. Justice Stearn, later Chief Justice, writing for this court in 1938, recognized the equitable basis of promissory estoppel and its origins in the more ancient concept of equitable estoppel:

[J]ust as the law has consistently upheld the doctrine that, under given circumstances, a person may be estopped by his conduct, his statements, or even his silence, if another has thereby been induced to act to his detriment, so from the earliest times there was recognized the principle that an estoppel might similarly arise from the making of a promise, even though without consideration, if it was intended that the promise be relied upon and in fact it was relied upon.... [The basis of promissory estoppel] is not so much one of contract, with a substitute for consideration, as an application of the general principle of estoppel to certain situations. It is important to bear in mind that, as already pointed out, the doctrine is much older in its origin and applications than the terminology now employed to describe it.

*Fried v. Fisher,* 328 Pa. 497, 500–01, 196 A. 39, 41–42 (1938)(footnotes omitted).

This court more recently has defined equitable estoppel as follows:

> Equitable estoppel is a doctrine that prevents one from doing an act differently than the manner in which another was induced by word or deed to expect. A doctrine sounding in equity, equitable estoppel recognizes that an informal promise implied by one's words, deeds or representations which leads another to rely justifiably thereon to his own injury or detriment may be enforced in equity.

*Novelty Knitting Mills v. Siskind,* 500 Pa. 432, 457 A.2d 502, 503 (1983).

Promissory estoppel is defined by Restatement of Contracts (2d)(1979) § 90, which provides in pertinent part:

> **§ 90. Promise reasonably inducing Action or Forbearance**
>
> (1) A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise. The remedy granted for breach may be limited as justice requires.

Since the matter relied upon by the distributors to create an estoppel is the conduct of *The Press,* not promises, the applicable theory is equitable estoppel,[2] not what is termed promissory estoppel. The question presented in this case, however, is not whether the estoppel relied upon is equitable or promissory, the initial question is whether estoppel of any kind is applicable where there is a written contract.

 It is hornbook law that a contract, either oral or written, may be modified by a subsequent agreement which is supported by legally sufficient consideration or a substitute

**2.** The distributors' amended complaint simply refers to "estoppel." The allegations of the estoppel counts are, in essence, that the distributors reasonably relied upon the "customs, practices and courses of dealing" created by the Press. This is an equitable estoppel claim. Amended Complaint, Count V, Estoppel.

therefor and meets the indicia of contract formation. Additionally, under the estoppel concept, a contract may be modified if either words or actions of one party to the contract induce another party to the contract to act in derogation of that contract, and the other justifiably relies upon the words or deeds of the first party.

The question in this case, then, resolves itself into whether *The Press* induced the distributors to act in derogation of the written contract (that the distribution agreement was terminable at will) and whether the distributors justifiably relied on this inducement to their detriment.

■ We are unable to find anything in the record which supports the claim that the distributors were induced to rely on acts or words in derogation of the written provisions of the contract that the distribution agreement was terminable at will. In fact, the claim seems to resolve itself into the notion that because *The Press* went out of business and this was financially injurious to the distributors, *The Press* ipso facto should be liable for any losses suffered by the distributors. Such a claim is frivolous.

We expressly reject the holding of the Superior Court in the *Straup* case that distributors have "a kind of conditional property right which could not be terminated at will." The distributors have contract rights which may, as stated above, be modified by subsequent contracts or by conduct or words which would create an estoppel. But, as we have determined, estoppel does not apply in this case. And when there is no more than a conflict of testimony as to whether the inducement to breach the contract did or did not occur, courts are properly suspicious of the claim, for persons of ordinary prudence will modify a writing with another writing in any matter of importance.[3]

3. Although we have upheld the modification of written contracts by estoppel in other cases, see *Ridley Park Shopping Center v. Sun Ray Drug Co.*, 407 Pa. 230, 180 A.2d 1 (1962) and *Fried v. Fisher* 328 Pa. 497, 196 A. 39 (1938), such cases, as we observed in *Thatcher's Drug Store v. Consolidated*, 535 Pa. 469, 636 A.2d 156 (1994), present

In this case, there was no inducement and so we need not even reach the question of justifiable reliance.

Order of the Superior Court is reversed.[4]

Justice ZAPPALA concurs in the result.

evidentiary problems and often become a credibility dispute between the parties.

4. The six former distributors who operated on oral agreements, did not allege that the Press ever expressly agreed to distribute newspapers indefinitely or that it would compensate individual distributors for the value of their distributorships and there was nothing in the other words or acts of the Press which would induce an expectation that any distributors would be compensated by the Press for the loss of their distributorships. Thus, both the contract claims and the equitable estoppel claims of these appellees were properly dismissed.