**In re LINCOLN COACH LINES, INC., Debtor.**

**Lisa M. Swope, Esq., Trustee: Plaintiff**

**v.**

**Myers Coach Lines, Inc., Defendant**

**Bankruptcy No. 99–28044–BM.**
**Adversary No. 01–2065–BM.**

United States Bankruptcy Court, W.D. Pennsylvania.

Dec. 21, 2001.

62

Lisa M. Swope, Ebensburg, PA, Chapter 7 Trustee.

Dennis J. Kusturiss, Pittsburg, PA, for Defendant.

### MEMORANDUM OPINION

BERNARD MARKOVITZ, Bankruptcy Judge.

The chapter 7 trustee has instituted this adversary action seeking to recover from defendant Myers Coach Lines, Inc. the sum of $25,000 which defendant agreed but has refused to pay to purchase debtor's operating authority for bus service between Pittsburgh and Grove City, Pennsylvania.

Defendant maintains that the agreement, arrived at during the chapter 11 phase of this bankruptcy case, is not enforceable because the chapter 7 trustee neither sought nor obtained the required court approval of the sale.

We will enter a judgment in the amount of $25,000 in favor of the chapter 7 trustee and against defendant for reasons set forth below.

### – FACTS –

Debtor Lincoln Coach Lines was a common carrier which provided passenger service to the general public. Among other things, debtor provided scheduled bus service between Pittsburgh and Grove City, Pennsylvania, under operating authority granted by the Pennsylvania Public Utility Commission ("PUC"). From 1984 until August of 2000, debtor was the only common carrier to provide such service between these destinations. The Pennsylvania Department of Transportation ("PENNDOT") further enhanced the value of the operating authority by providing operating assistance grants to subsidize debtor's operation of the route.

Debtor filed a voluntary chapter 11 petition on November 29, 1999, and thereafter continued operating its business as a debtor-in-possession while it attempted to reorganize. Although it clearly had value, its operating authority for the Pittsburgh–to–Grove City route was not listed as an asset on debtor's bankruptcy schedules.

Debtor came to realize in August of 2000 that it would have to cease operating as of August 20, 2000, because it could not pay the required liability insurance premium that was about to become due.

After coming to this realization but before debtor ceased operating, debtor's president, Dennis Long, inquired of other common carriers in the area whether they were interested in purchasing debtor's operating authority for its Pittsburgh–to–Grove City service.

Included among those carriers indicating an interest in this valuable asset was defendant Meyers Coach Lines, represented by its president, David Myers. Specifically, Myers, for defendant, offered the

sum of $25,000 to purchase debtor's operating authority, which offer Long promptly accepted.

Long drafted a letter agreement on August 18, 2000, which provided in pertinent part that "[a]s of August 21, 2000, Myers Coach Lines will purchase the Pittsburgh-to-Grove City Line Run from Lincoln Coach Lines for the sum of $25,000". Long executed the agreement on August 18, 2000, and faxed it to David Myers, who promptly executed and faxed it back to Long that same afternoon. Neither debtor nor defendant had consulted with their respective counsel prior to entering into the agreement.

On August 20, 2000, debtor closed its doors for the final time and ceased providing bus service between Pittsburgh and Grove City.

Despite having no authority of its own from the PUC to operate the route, defendant began operating between Pittsburgh and Grove City on the morning of August 21, 2000. Defendant's apparent authority for so acting must have been based upon the August 18, 2000 letter agreement, as no other basis for its activities has been offered.

After consulting with counsel, who holds himself out as an expert in PUC matters, defendant was advised that the letter agreement dated August 18, 2000, was not enforceable without approval of the bankruptcy court. Defendant instead decided on August 21, 2000, to seek *its own* operating authority for the above route and to forego the administrative process of having debtor's operating authority transferred to it. Counsel advised defendant that defendant could obtain emergency operating authority from the PUC within a few days and that the PUC would "look the other way" while defendant operated the bus route in the interim.

On August 25, 2000, defendant's counsel "walked" the application to and through the PUC requesting emergency authority to operate the route. Its application was granted that same day in an emergency order issued *ex parte* by the PUC's board chairman. The entire board of the PUC, without notice or hearing, ratified the emergency order six days later.

On August 28, 2000, eight days after it had ceased operating, debtor filed a motion requesting conversion of its case to a chapter 7 proceeding. Its motion was granted on September 8, 2000. The order appointing the present chapter 7 trustee was dated September 11, 2000. She became aware of her appointment a few days later.

Defendant applied to the PUC on September 11, 2000, for its own *permanent* authority to operate the above bus route between Pittsburgh and Grove City. Notice of its application was printed in the September 30, 2000, edition of *Pennsylvania Bulletin*.

Two days thereafter, on September 13, 2000, defendant submitted an application to PENNDOT for an assistance grant to subsidize its operation of the Pittsburgh-to-Grove City route.

On or about October 6, 2000, the chapter 7 trustee learned from debtor's president for the first time about the above operating authority and about the agreement of August 18, 2000. As was previously noted, this operating authority was not listed on debtor's bankruptcy schedules as an estate asset.

PENNDOT notified defendant on October 24, 2000, that its operating assistance grant for the Pittsburgh-to-Grove City route would remain in effect unless and until the bankruptcy court approved a transfer of debtor's operating authority for the same route to a party other than defendant. Defendant advised neither debt-

or, the trustee, nor the bankruptcy court of this PENNDOT determination.

Because she was preoccupied after her appointment with sorting through the chaotic state of debtor's affairs, the chapter 7 trustee did not immediately approach defendant concerning the letter agreement of August 18, 2000. Shortly prior to a sale of debtor's vehicles during the latter part of October of 2000, the chapter 7 trustee spoke to David Myers and informed him that she wanted to seek court approval of the sale of debtor's operating authority for the Pittsburgh–to–Grove City route. Myers led the chapter 7 trustee to believe that defendant was still interested in purchasing debtor's operating authority for the route. He did not disclose that defendant had applied to the PUC for its own operating authority and had applied to PENNDOT for its own operating assistance grant for the route.

Subsequent to this discussion, the chapter 7 trustee attempted, without success, to further discuss with David Myers the sale of debtor's operating authority to defendant. Her phone calls to him went unanswered.

The PUC initiated a proceeding on November 3, 2000, to revoke debtor's operating authority for the above route because of debtor's failure to maintain required liability insurance. Although the complaint was served at debtor's vacated place of business, the chapter 7 trustee did not receive notice of the proceeding and consequently did not respond thereto.

After her phone calls to David Myers went unanswered, the chapter 7 trustee sent him a letter on November 17, 2000, which in essence requested that defendant cooperate with her in securing bankruptcy court approval of the route transfer. The chapter 7 trustee was "anxious" to begin the process of obtaining court approval of the sale of debtor's operating authority for the Pittsburgh–to–Grove City route because obtaining it "may take some time". Myers was asked to contact her to discuss the sale. If no response was forthcoming by November 30, 2000, the chapter 7 trustee stated, she would conclude that defendant would not cooperate and would seek another purchaser.

For obvious reasons, Myers did not immediately respond to the chapter 7 trustee's letter. Meyers must have realized that the chapter 7 trustee still had time to thwart defendant's machinations if she learned of them long enough before the PUC approved defendant's application for its own permanent operating authority.

On November 17, 2000, defendant entered into an agreement with PENNDOT for operating assistance for the Pittsburgh–to–Grove City route. The grant, which amounted to $88,403, covered the period from August 21, 2000, through June 30, 2001.

On November 30, 2000, the PUC approved defendant's application for permanent authority to operate the Pittsburgh–to–Grove City bus route it had begun operating on August 21, 2000.

Defendant's counsel, who had deftly steered defendant's applications for its own permanent operating authority and for an operation assistance grant from PENNDOT through the administrative maze which such applications must traverse, finally responded on November 30, 2000, to the chapter 7 trustee's letter of November 17, 2000. He informed the chapter 7 trustee that defendant was no longer interested in purchasing debtor's operating authority for the Pittsburgh–to–Grove City bus route and stated that defendant therefore did not desire to seek bankruptcy court approval for such a sale. His letter gave no indication, however, that defendant had just received its own per-

manent operating authority to operate the route.

In a telephone conversation the next day, counsel to defendant finally informed the chapter 7 trustee that defendant was no longer interested in purchasing debtor's operating authority because defendant had obtained final PUC approval for its own operating authority. Prior to this conversation the chapter 7 trustee had no knowledge that defendant had applied for its own operating authority.

The PUC issued a final order on December 15, 2000, revoking debtor's operating authority for the Pittsburgh–to–Grove City bus route. The chapter 7 trustee took no action to have the order reconsidered or rescinded.

The chapter 7 trustee wrote to defendant's counsel on January 23, 2001, demanding that defendant abide by the agreement of August 18, 2000, and pay debtor the sum of $25,000 for debtor's operating authority. Defendant did not respond to the chapter 7 trustee's demand letter and did not pay anything to debtor's bankruptcy estate in accordance with the letter agreement of August 18, 2000.

The chapter 7 trustee commenced the present adversary action on February 26, 2001, seeking to recover the $25,000 purchase price defendant had agreed in the letter agreement to pay for debtor's operating authority for the Pittsburgh–to–Grove City route. The funds, if recovered, would be used to pay debtor's creditors.

The matter was tried on October 18, 2001, at which time both sides were given an opportunity to present evidence on the issues raised in the case.

## – DISCUSSION –

■ The sale contemplated in the agreement of August 18, 2000, was not in the ordinary course of debtor's business.

Debtor was a common carrier in the business of transporting passengers. The sale of its operating authority to another common carrier was not a type of transaction commonly undertaken by companies in the common carrier industry. *In re Roth American,* 975 F.2d 949, 952–53 (3d Cir. 1992).

A bankruptcy trustee's authority to sell an estate asset outside the ordinary course of the debtor's business is restricted. Such a sale may take place only after notice and a hearing. 11 U.S.C. § 363(b). The Third Circuit has construed this Bankruptcy Code provision as also requiring bankruptcy court approval. *Northview Motors, Inc. v. Chrysler Motors Corp.,* 186 F.3d 346, 351 (3d Cir.1999). Absent such approval, the transaction is not effective. *Calpine Corp. v. O'Brien Environmental Energy, Inc. (In re O'Brien Environmental Energy, Inc.),* 181 F.3d 527, 530 (3d Cir.1999).

A hearing concerning the sale of the above operating authority did not take place because the chapter 7 trustee never requested one. As a consequence, court approval for such a transfer was never obtained. Deciding that defendant had taken unfair advantage of her, to the detriment of the estate's creditors, the chapter 7 trustee brought this adversary action after counsel to defendant informed the chapter 7 trustee that defendant had obtained its own operating authority and therefore no longer was interested in purchasing debtor's operating authority.

The chapter 7 trustee stated at trial that she sought recovery from defendant under two theories.

She seeks to recover under the principle of quasi-contract on the theory that defendant allegedly was "unjustly enriched" at the expense of the bankruptcy estate when

defendant acquired a valuable estate asset at no cost to it.

Notwithstanding the absence of a hearing and court approval of the transaction, the chapter 7 trustee also seeks to have the agreement of August 18, 2000, "enforced" on the theory that debtor was ready and willing and, in fact, had performed under the terms of the agreement while defendant refused to do so. She requests a determination that defendant breached the agreement by refusing to perform and seeks to recover the agreed-upon $25,000 purchase price.

The crux of defendant's position is that it was not obligated to perform because the agreement of August 18, 2000, was not enforceable due to the chapter 7 trustee's failure to request a hearing and to obtain court approval of the sale. Defendant further denies deceiving the chapter 7 trustee by indicating that it intended to consummate the agreement. Rather than deceiving the chapter 7 trustee, defendant insists that it merely failed to inform the chapter 7 trustee of its efforts to obtain its own operating authority, about which it purportedly had no duty to inform the chapter 7 trustee.

 Unjust enrichment is an equitable doctrine. *Mitchell v. Moore*, 729 A.2d 1200, 1203 (Pa.Super.), *appeal denied*, 561 Pa. 698, 751 A.2d 192 (2000). Where unjust enrichment is found, the law implies a contract, usually referred to as a quasi-contract or as a contract implied-in-law, which requires defendant to make restitution to plaintiff in *quantum meruit*. *Schenck v. K.E. David, Ltd.*, 446 Pa.Super. 94, 97, 666 A.2d 327, 328 (1995) *appeal denied*, 544 Pa. 660, 676 A.2d 1200 (1996).

 To prevail on a claim of unjust enrichment, plaintiff must establish that the party against whom recovery is sought either wrongfully secured or passively received a benefit that would be unconscionable for that party to retain. *Torchia v. Torchia*, 346 Pa.Super. 229, 233, 499 A.2d 581, 582 (1985).

 The elements necessary to establish unjust enrichment are: (1) that a benefit was conferred on defendant by plaintiff; (2) that defendant retained such benefit; and (3) that it would be inequitable for defendant to retain the benefit without paying its value. *Schenck*, 446 Pa.Super. at 97, 666 A.2d at 328. A showing of knowledge or wrongful intent on the part of the party benefitted is not required. The focus is on the resultant unjust enrichment. *Torchia*, 346 Pa.Super. at 233, 499 A.2d at 581–82. Application of the doctrine requires a fact-intensive inquiry. *Id.*

 The doctrine of unjust enrichment applies here. In fact, this situation exemplifies the significance of the simplistic phrases "Knowledge is Power" and "Timing is Everything". Had debtor's president not contacted defendant's president when he did, defendant would not have had advance knowledge of the cessation of debtor's operation of the route. Armed with this knowledge and with the realization that the PUC would not, at least for a short while, take action against defendant for operating the route without its own authority to do so, defendant took unfair advantage of debtor and ultimately of debtor's creditors.

From at least August 21, 2000, when defendant began operating the Pittsburgh-to–Grove City route, until August 25, 2000, when it applied for and obtained on the same day its own emergency operating authority from the PUC, defendant's operation of the route effectively was based on debtor's operating authority which it had agreed to purchase from debtor. Unfortu-

nately for debtor and its creditors, defendant refused to pay.

In other words, debtor conferred a benefit upon defendant which defendant gladly retained. (It might be more accurate to say that defendant expropriated debtor's operating authority and used it for its own benefit.) Defendant's counsel, who was "well connected" to the PUC's board of directors, knew that defendant could exploit debtor by relying upon debtor's operating authority during this time without suffering adverse repercussions from the PUC. Defendant could "freeze out" other carriers who may have had an interest in the route while depriving debtor's creditors of this valuable asset. It would be inequitable under such circumstances for defendant to reap this benefit without paying what it previously agreed was its value.

The value of this benefit and the amount the chapter 7 trustee reasonably could expect to recover from defendant for this benefit, at first blush, appears nominal. However, defendant and debtor's president negotiated the value of this timing, this apparent authority, and this special knowledge. In this light we accept their determination that this knowledge, apparent authority, and this timing is worth $25,000.

The matter does not end there. We arrive at the same outcome even if the trustee's cause of action for unjust enrichment fails for any reason. It is not immediately obvious what theory the chapter 7 trustee has in mind when she asserts that we should "enforce" the agreement of August 18, 2000, and should find that debtor breached the agreement despite the absence of a hearing and court approval thereof. We understand the chapter 7 trustee to assert, perhaps inartfully, that defendant is equitably estopped from asserting that the agreement is not enforceable because of the chapter 7 trustee's

failure to request a hearing and to obtain the required court approval of the transaction. Defendant's assertion that the agreement is not enforceable, we previously noted, constitutes the linchpin of its defense in this case.

Equitable estoppel, like unjust enrichment, sounds in equity. *Zitelli v. Dermatology Education and Research Foundation,* 534 Pa. 360, 370, 633 A.2d 134, 139 (1993). It is a principle of "fundamental fairness" whose application depends on the facts peculiar to a case. *Homart Development Co. v. Sgrenci,* 443 Pa.Super. 538, 554, 662 A.2d 1092, 1100 (1995).

The effect of equitable estoppel has been variously described. Its application makes it possible to enforce a promise implied by words, deeds, or representations which promise induces another to justifiably rely to their injury or detriment. *Kreutzer v. Monterey County Herald Co.,* 560 Pa. 600, 606, 747 A.2d 358, 361 (2000). It also serves to prevent one from assuming a position or asserting a right to another's disadvantage or prejudice which is at odds with a previously-taken position. *Blofsen v. Cutaiar,* 460 Pa. 411, 417, 333 A.2d 841, 844 (1975).

Equitable estoppel consists of two essential elements: (1) inducement; and (2) justifiable reliance on that inducement. *Novelty Knitting Mills, Inc. v. Siskind,* 500 Pa. 432, 436, 457 A.2d 502, 503 (1983). The inducement may arise out of word or deed. The conduct that is induced may occur by commission or by forbearance, provided that a detrimental change in condition results. *Id.* 500 Pa. at 436, 457 A.2d at 503–04.

The party asserting equitable estoppel has the burden of proving these requirements by clear, precise, and un-

equivocal evidence. *Blofsen,* 460 Pa. at 417–18, 333 A.2d at 844.

■ Evidence presented at trial clearly establishes that defendant induced the chapter 7 trustee to believe, until it was too late for the chapter 7 trustee to realistically find another purchaser and obtain court approval of a sale to that other purchaser, that defendant would consummate the agreement of August 18, 2000.

Two or three weeks after the chapter 7 trustee first learned of the agreement between defendant and debtor, David Myers falsely and misleadingly represented to the chapter 7 trustee that defendant still intended to purchase debtor's operating authority for the Pittsburgh–to–Grove City bus route. Myers undoubtedly realized when he so represented that his representation was false. By that time defendant no longer was interested in purchasing debtor's operating authority and had no intention of abiding by the agreement of August 18, 2000. Defendant had applied to the PUC more than a month earlier for its own operating authority and was expectantly awaiting approval of its application.

Myers so represented to the chapter 7 trustee for the purpose of inducing the chapter 7 trustee to refrain from finding another purchaser for debtor's operating authority and then obtaining court approval of a sale to that purchaser before defendant received final approval from the PUC of its own application. He recognized that it most likely would be futile for the chapter 7 trustee to seek another purchaser once defendant had obtained its own authority. No one would then be interested in purchasing debtor's operating authority.

Defendant wanted to prevent any competition on the Pittsburgh–to–Grove City route once defendant's own application was approved. The route had but a single operator—i.e., debtor—during the sixteen-year period from 1984 until August of 2000. The lack of a competing operator during this entire period leads us to infer that more than a single operator could not profitably provide service along the route. The fact that PENNDOT provided an operating assistance grant in excess of $88,000 for this route bolsters this conclusion. It also bolsters the conclusion that this route is valuable and that it could have been sold, with the proceeds utilized to pay debtor's creditors.

This inference also explains why the chapter 7 trustee did not bother to seek another purchaser and obtain court approval of a sale of debtor's operating authority to that other purchaser after she learned on December 1, 2000, that defendant had obtained its own operating authority. It was a virtual certainty that no other operator would be interested in purchasing debtor's operating authority once defendant had obtained its own permanent operating authority.

The chapter 7 trustee's reliance on the above inducement defendant provided was justifiable in light of surrounding circumstances. The existence of debtor's authority to operate the Pittsburgh–to–Grove City bus route was not even listed as an asset on debtor's bankruptcy schedules. She was not informed of the agreement between debtor and defendant until October 6, 2000, when debtor's president first informed her of the agreement. Her attention immediately after her appointment was directed to imposing order on the chaos she inherited when debtor's case was converted to a chapter 7 proceeding.

Publication of notice in the September 30, 2000, edition of *Pennsylvania Bulletin* does *not* undermine the justifiability of the chapter 7 trustee's reliance upon the above false and misleading representation to her made by David Myers. The chapter 7 trustee had no knowledge of the existence

of debtor's own operating authority for the Pittsburgh–to–Grove City bus route when this edition of *Pennsylvania Bulletin* was published. Moreover, the law firm of which the chapter 7 trustee is a member did not subscribe to *Pennsylvania Bulletin.* Finally, the law library of the county in which the chapter 7 trustee is located did not subscribe to it. As a consequence, the chapter 7 trustee had no reason to suspect that defendant was in the process of obtaining its own permanent operating authority and consequently had no intention of performing in accordance with the letter agreement dated August 18, 2000.

It appears that defendant behaved as it did on the advice of its learned counsel, who boasted under oath at trial that he was one of only a half dozen or so attorneys in all of Pennsylvania who practiced regularly before the PUC. In a display of unabashed hubris, counsel stated that he always relished opposing counsel who were not versed in the intricacies of practicing before the PUC because he invariably came out on top.

We also have little doubt that defendant responded as it did to the chapter 7 trustee's inquiry concerning its continued interest in purchasing debtor's operating authority because it knew that the chapter 7 trustee was not in a position to recognize that its representation of continued interest was false and misleading.

The chapter 7 trustee's justifiable reliance upon the above false and deliberately misleading inducement of defendant resulted in detriment to debtor's bankruptcy estate. As a consequence of her justifiable reliance, the chapter 7 trustee did not pursue other potential buyers for as long as she had no reason to disbelieve defendant's profession of continued interest in consummating the agreement of August 18, 2000.

We find no fault in the chapter 7 trustee's failure to pursue other potential buyers and to seek court approval of a sale to them of debtor's operating authority *after* she learned that defendant had obtained its own permanent authority to operate along that same route. As we previously indicated, it was a virtual certainty that no more than one operator could profitably provide bus service between Pittsburgh and Grove City. Further pursuit of the matter undoubtedly would have been to no avail. No one would have come forward had the chapter 7 trustee brought a motion to obtain court approval of such a sale. Had she persisted and brought such a motion under these circumstances, we no doubt would have voiced our displeasure with the chapter 7 trustee and would have remonstrated with her.

We conclude in light of the foregoing that defendant also is equitably estopped from asserting in this instance that the agreement of August 18, 2000, is not enforceable in light of the chapter 7 trustee's failure to seek and obtain court approval thereof. Notwithstanding her undisputed failure to do so, we conclude that defendant breached the agreement when, on the advice of its attorney, it refused to consummate the agreement by purchasing debtor's operating authority for the sum of $25,000.

The most appropriate measure of damages for defendant's breach of the agreement is the amount it agreed to pay debtor for debtor's operating authority—i.e., $25,000. This amount, we believe, represents the market value of the asset when defendant agreed to purchase it. We therefore will enter a judgment in this amount in favor of the chapter 7 trustee and against defendant.

An appropriate order shall issue.