J-A14036-15

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P 65.37**

| | | |
|---|---|---|
| CIRCLE BOLT AND NUT COMPANY, INC., | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| Appellant | : | |
| | : | |
| v. | : | |
| | : | |
| KEYSTONE HELICOPTER CORPORATION, | : | |
| | : | |
| Appellee | : | No. 1401 MDA 2014 |

Appeal from the Judgment Entered September 18, 2014,
in the Court of Common Pleas of Luzerne County,
Civil Division, at No(s): 2010-14500

BEFORE:   BENDER, P.J.E., JENKINS, and STRASSBURGER,* JJ.

MEMORANDUM BY STRASSBURGER, J.:            **FILED JULY 17, 2015**

Circle Bolt and Nut Company, Inc. (Circle) appeals from the judgment entered against it and in favor of Keystone Helicopter Corporation (Keystone) following a non-jury trial.[1]  Upon review, we affirm.

Keystone is in the business of manufacturing aircraft.  Circle is a supplier of hardware to various manufacturers, offering them, *inter alia*, the ability to move to a vendor-managed inventory (VMI).  Under a VMI agreement, Circle provides one of its employees to work on-site at a

---

[1] Circle purported to appeal from the order denying its post-trial motion, which does not constitute an appealable order.  **Fanning v. Davne**, 795 A.2d 388, 391 (Pa. Super. 2002) (providing appeal to Superior Court can lie only from judgment entered subsequent to the trial court's disposition of any post-verdict motion, not from the order denying post-trial motion).  At the direction of this Court, judgment was entered in this matter on September 18, 2014.  We have amended the caption accordingly.

*Retired Senior Judge assigned to the Superior Court.

manufacturer to manage the inventory of certain agreed-upon parts. Management of the inventory includes ensuring the number of parts on-hand are maintained at minimum and maximum levels and that the parts are replenished as appropriate per the agreement.

Keystone had VMI agreements with various suppliers, and also purchased parts on an *ad hoc* basis from both Circle and other suppliers. In April of 2009, Keystone entered into a three-year VMI contract with Circle. That contract provides, in relevant part, as follows.

12. TERMINATION
Both parties have a right to terminate this AGREEMENT at will. If [Keystone] initiates termination, [Keystone] will: (1) provide three (3) month written notice, (2) Be liable for all product in stock, on order, or in route for the fulfillment of the [Keystone] program, less any standard stock items, CIRCLE will invoice [Keystone] for such products, stock, etc. which invoice shall be due and payable within sixty (60) days.

\*\*\*

14. ENTIRE UNDERSTANDING AND AGREEMENT
This Agreement contains the entire understanding between the parties with respect to the subject matter contained herein, and no modification or waiver of any provision hereof shall be valid unless in writing and signed by the parties hereto.

\*\*\*

16. Addendum A, Pricing is a part of this Agreement.

Contract, 4/2/2009.

Addendum A to the contract is a spreadsheet which enumerates approximately 600 parts included in the Agreement. In addition to the part

number, Addendum A has columns for estimated annual usages for the part (EAUs), the price per part, and the cost for that part for the whole year. All pages of Addendum A were initialed by Duncan McCory, director of purchasing at Keystone. Keystone provided the EAUs to Circle, which then set up bins of parts at Keystone and managed the usage.

According to Jim Castellino, then a vice-president at Circle, Keystone asked Circle to "take on more blue dot parts" in addition to those enumerated in Addendum A.[2] N.T., 6/30/2014, at 25. Castellino testified that he and Jeanne Kondraski, director of sales at Circle, met with Debbie Logan, a senior buyer at Keystone, who requested that Circle

> [t]ake on all the parts you can. We want you to take over all the blue dot parts. And what basically was happening was [Kondraski] would give [Castellino] the information after she got the part numbers that they wanted and the [EAUs] and [Castellino] would put it together on a spreadsheet and submit it to [Keystone] to try to formalize this so they could add it to the contract. And [Circle] persisted with asking about please add this to the contract. It was never done. But in the meantime, [Circle was] supplying the parts and [Keystone was] paying for them.

*Id*. at 25-26.

Kondraski testified that she received an e-mail from Logan asking if "Circle is almost ready to take over all the blue dots…." *Id*. at 65. Kondraski interpreted this e-mail as Logan's asking her "to start looking at all of the

---

[2] Blue dot refers to parts that are kept on a "min/max." N.T., 9/20/2011, at 25. They are separate from a VMI, and are kept in stock in a warehouse because they are heavily used items. *Id*.

blue dots that are not already in the [VMI] program and start taking them over." *Id*.

On June 22, 2009, Castellino sent an e-mail with the subject line "Addendum B" to Paul Day, who was then the purchasing supervisor for the VMI at Keystone. That e-mail stated, in its entirety: "Confirming our meeting with [Logan] on Friday, attached is the new addendum to add to the blue dot list. Please add to the contract and confirm back to us in order for us to begin scanning." Circle's Exhibit 10, E-mail from Castellino to Day, 6/22/2009. Addendum B included 172 additional parts. *See* Circle's Exhibit 3. On July 23, 2009, Castellino sent an e-mail to Day with Addendum C, which included 80 additional parts.[3] *See* Circle's Exhibit 35.

On September 10, 2009, Logan sent an e-mail with a subject line of a part number to Tim Judge, Director of Procurement at Circle, which instructed Circle to "[p]lease add to our [V]MI and get them to us asap. … I want to start with [a quantity] of 100[.]" Circle's Exhibit 25, E-mail from Logan to Judge, 9/10/2009.

---

[3] Addenda B and C were identical to Addendum A in that they were spreadsheets containing columns for EAUs, price per part, and price per year. However, some of the parts did not have all of the columns filled in, particularly EAUs. Kondraski testified that she "can't quote a list of random parts without [EAUs]." N.T., 6/30/2014, at 74. She further testified that Day was supposed to get her the [EAUs], but never did and "then it fell off the map." *Id*.

Logan testified that she "was hoping to get all blue dots taken over, but things happened and my company said no. … Just like with any vendor that handles our blue dots, which is multiple vendors, there's [*sic*] no contracts for those parts. It's more like what we consider a one-time buy." N.T., 9/20/2011, at 41. Logan attempted to clarify the nature of various types of purchases at Keystone. She testified that the parts discussed "would become parts for [Circle] to fill, but not contracted parts." ***Id***. at 47.

Castellino testified that among the three addenda, Circle was providing 878 different parts, and was then instructed by Keystone to "take over all blue dots" which would have included "800 to 900" more parts "totaling over 1700 parts." N.T., 6/30/2014, at 29. Castellino realized that addenda B and C, as well as all additional parts were "never officially signed off" and they were "pursuing that at the time." ***Id***. This understanding is confirmed in an e-mail from Castellino to Day, wherein Castellino informed Day that Circle would like to meet with the Keystone team to "review all the items (pricing and approvals) and inventory levels so we can both have an understanding of the expectations going forward." Circle's Exhibit 30, E-mail from Castellino to Day, 2/4/2010.

According to Day, Keystone began experiencing problems with Circle. He testified: "We had slow to no turn around requests on bids, quotes last

half of 2009 to the point where [Keystone's buyer, Hampford,] isn't quoting hardware with [Circle] anymore." N.T., 6/30/2014, at 165.

After experiencing a series of issues, including bins being out of stock, on April 26, 2010, Keystone sent a letter to Circle exercising its 90-day exit clause to terminate the contract. Pursuant to paragraph 12 of the Agreement, Keystone paid Circle for the remaining inventory for the parts listed in Addendum A. However, Keystone did not pay Circle for the value of the remaining inventory listed in addenda B and C.

On November 12, 2010, Circle filed a complaint against Keystone for breach of contract and promissory estoppel, specifically requesting payment of $252,838.03 for parts remaining in inventory that are listed in addenda B and C. A non-jury trial was held on June 30, 2014, and on July 7, 2014, the trial court entered a verdict in favor of Keystone and against Circle, with the following relevant findings of fact and conclusions of law.

10. The contract entered into on April 2, 2009 by [Circle] and [Keystone] was not modified by Addendums B and C.

11. [Circle] and [Keystone] entered into separate and distinct contracts with regard to the parts listed in Addendums B and C.

12. No evidence was presented by [Circle] to indicate that [Keystone] ever agreed to accept and pay for the Addendum B and C parts remaining in [Circle's inventory].

13. [Circle] has failed to prove a breach of the written contract dated April 2, 2009 by [Keystone].

14. [Circle] has failed to prove its claim based on promissory estoppel.

Findings of Fact, 7/7/2014, at ¶¶ 10-14.

Circle filed post-trial motions, which were denied, and Circle timely filed a notice of appeal. The trial court did not order Circle to file a concise statement of errors complained of on appeal, and none was filed.

On appeal, Appellant sets forth four questions for our review.

> 1. Did the [trial] court make an error in applying the law by failing to find a modification of the original contract?
>
> 2. Alternatively, did the [trial] court make an error in applying the law by concluding that [Keystone] did not enter into a contract with [Circle] requiring purchase of all parts remaining in inventory?
>
> 3. Did the [trial] court make an error in applying the law by concluding [Circle] did not prove promissory estoppel?
>
> 4. Was the [trial] court's verdict against the weight of the evidence?

Circle's Brief at 4 (unnecessary capitalization and suggested answers omitted).

Circle's first three issues challenge the trial court's denial of its motion for judgment notwithstanding the verdict (judgment N.O.V.).

> In reviewing a trial court's decision whether or not to grant judgment in favor of one of the parties, we must consider the evidence, together with all favorable inferences drawn therefrom, in a light most favorable to the verdict winner. Our standard of review when considering motions for a directed verdict and judgment notwithstanding the verdict are identical. We will reverse a trial court's grant or denial of a judgment

notwithstanding the verdict only when we find an abuse of discretion or an error of law that controlled the outcome of the case. Further, the standard of review for an appellate court is the same as that for a trial court.

There are two bases upon which a judgment N.O.V. can be entered: one, the movant is entitled to judgment as a matter of law and/or two, the evidence is such that no two reasonable minds could disagree that the outcome should have been rendered in favor of the movant. With the first, the court reviews the record and concludes that even with all factual inferences decided adverse to the movant the law nonetheless requires a verdict in his favor, whereas with the second the court reviews the evidentiary record and concludes that the evidence was such that a verdict for the movant was beyond peradventure.

*Lanning v. West*, 803 A.2d 753, 756 (Pa. Super. 2002) (quoting *Goldberg v. Isdaner*, 780 A.2d 654, 659-60 (Pa. Super. 2001)) (internal quotations and citations omitted).

The contract at issue is governed by the Uniform Commercial Code (UCC) provisions for the sale of goods, codified in Pennsylvania at 13 Pa.C.S. §§ 2101-2705. Modification of a contract under the UCC is governed by section 2209, and provides, in relevant part, as follows.

\*\*\*

**(b) Writing excluding modification or rescission.**--A signed agreement which excludes modification or rescission except by a signed writing cannot be otherwise modified or rescinded, but except as between merchants such a requirement on a form supplied by the merchant must be separately signed by the other party.

\*\*\*

**(d) Ineffective modification or rescission as waiver.**-- Although an attempt at modification or rescission does not satisfy the requirements of subsection (b) or (c) it can operate as waiver.

\*\*\*

13 Pa.C.S. § 2209.

Relying on the UCC and this Court's interpretation of these provisions in ***J.W. Goodliffe & Son v. Odzer***, 423 A.2d 1032 (Pa. Super. 1980), Circle first argues the trial court's finding that the original contract was not modified to add Addenda B and C was error. Circle's Brief at 11-16. We summarize that case as follows.

***J.W. Goodliffe*** involved Odzer, a scrap dealer, and J.W. Goodliffe, a supplier of industrial gas. J.W. Goodliffe delivered gas in reusable containers, for which it typically charged demurrage (or rental). J.W. Goodliffe and Odzer did business for approximately one year pursuant to an oral contract, then the parties entered into a written contract. The written contract initially contained a provision requiring Odzer "would return the cylinders to [J.W. Goodliffe], and would pay demurrage for the late return…". *Id*. at 1033. Two to three months later, J.W. Goodliffe approached Odzer and requested he pay demurrage during the course of the contract. Eventually, Odzer agreed orally to do so by passing along the costs to his customers.

Odzer paid demurrage for three years; however, upon termination of the contract, Odzer did not return the cylinders. J.W. Goodlife instituted a breach of contract action against Odzer for, *inter alia*, gas that was delivered and the value of 200 cylinders. Odzer filed a counterclaim for the demurrage paid over the course of the contract, asserting that it was "improper under the written contract between the parties and had been paid in error." *Id*.

This Court analyzed the aforementioned UCC provisions:

> It is settled that the Uniform Commercial Code changed the law with regard to the oral modification of a contract that by its terms requires any modification to be in writing.
>
> ***
>
> When [the aforementioned] provisions are applied to the present case, it is evident that section [2209(b)] prevented the conversation between [Odzer] and [J.W. Goodliffe] from serving as an effective modification of the contract. However, the conversation did constitute what is referred to in section [2209(d)] as "an attempt at modification." This attempt, when combined with a course of dealing over a period of more than three years and hundreds of transactions in which [J.W. Goodliffe] charged and [Odzer] paid demurrage, represented a waiver. In this regard, section [2208] of the U.C.C. provides that when a contract provides for repeated occasions of performance, the course of performance is relevant in determining the meaning of the contract and the existence of a modification or waiver of any term inconsistent with the actual course of performance.

*Id.* at 1034-35. Accordingly, this Court affirmed the judgment of the trial court which found in favor of J.W. Goodliffe on Odzer's counterclaim.

Instantly, Circle points to an e-mail from Keystone to Circle requesting that "non-Addendum A parts [] be added to the [VMI]" as evidence of an attempt at modification. Circle's Brief at 15; Circle's Exhibit 25, E-mail from Logan to Judge, 9/10/2009. Circle then argues that the subsequent course of performance, proven through thousands of pages of invoices for non-Addendum A parts that were paid by Keystone, evidenced a modification of the contract. Circle's Brief at 15.

Keystone responds that, "[a]t most, there was an offer by [Circle] to modify by adding Addenda B and C parts to the contract, in hopes perhaps that all key terms of that contract would govern Addenda A, B, and C parts equally." Keystone's Brief at 13. However, Keystone claims that "offer was never accepted to form a binding contract." *Id*.

We agree with Circle that there was clearly an attempt by Circle to modify the contract. Thus, applying the law to the facts at issue in this case, we must determine whether, pursuant to *J.W. Goodliffe*, the record supports a conclusion that the course of performance between the parties operated to modify the contract.

Keystone offered an alternative explanation about how it purchased and paid invoices for non-Addendum A parts. Specifically, it presented testimony from Logan that these other parts, namely blue dots, were not

part of a contract; rather, they were *ad hoc* purchases which were treated

by Keystone like any other *ad hoc* purchase from any vendor.

Q. You mentioned that Circle [] supplied some blue dots outside of the VMI?

A. Correct.

Q. How did Keystone distinguish between those parts that were purchased pursuant to the VMI and those that were blue dots?

A. Our blue dots we quote out to several different vendors. We don't have any contracts for them at all. Whoever had the product and best price is kind of who we would go with. That was our usual format.

Q. Drawing your attention back to the e-mail…[4]

A. Yes.

Q. You don't refer anywhere in there to bidding out these blue dots. It just says you wanted them taken over by Circle.

A. This would lead me to believe that we already quoted these out.

Q. What was your process for quoting out parts?

A. We would have a parts list. Put it on a PO, and send it out to Kalco [ph], B/E, Circle, how many we needed, and wait for them to send us a quote back.

\*\*\*

Q. Would these blue dots have been invoiced separately from the VMI?

---

[4] This e-mail, dated June 18, 2009, was from Logan to Kondraski, asking "Is Circle almost ready to take over all blue dots…?" Circle's Exhibit 15, E-mail from Logan to Kondraski, 6/18/2009.

A.  Yes.

N.T., 9/20/2011, at 28-29 (footnote added).

This testimony, if believed by the factfinder, supports the finding that the course of performance between the parties was that non-Addendum A parts were purchased on an *ad hoc* basis rather than as part of the VMI agreement.  Thus, record evidence supports the trial court's finding that while Circle made an attempt to modify the VMI agreement, Keystone never signed off on the agreement or acted as though it was accepting these parts as part of that original agreement.  Accordingly, Circle is not entitled to relief on this basis.  ***See L.B. Foster Co. v. Charles Caracciolo Steel & Metal Yard, Inc.***, 777 A.2d 1090, 1092-93 (Pa. Super. 2001) ("It is not the role of an appellate court to pass on the credibility of witnesses or to act as  the trier of fact.  In a non-jury trial, the factfinder is free to believe all, part, or none of the evidence, and the Superior Court will not disturb the trial court's credibility determinations.") (citation omitted).

Next, Circle contends that even if the original VMI contract was not modified, there was an independent contract for addenda B and C which included the term that Keystone would pay for parts remaining in inventory in the event of termination. Circle's Brief at 16-19.  Circle relies upon Kondraski's testimony about the industry standard.  She testified that as part of a VMI, "the standard in the industry is to purchase any remaining

parts in a supplier's inventory upon termination of a vendor managed bin stocking program." *Id*. at 19.

Instantly, the trial court found that indeed Addenda B and C were separate contracts. Finding of Fact, 7/7/2014, at ¶ 11. The trial court also concluded that those independent contracts did not require Keystone to purchase the parts remaining in inventory upon termination of the Agreement. *Id*. at ¶ 15.

Again, this conclusion is supported by the record. We have already affirmed, *supra*, the trial court's finding that the parts purchased as part of addenda B and C were purchased on an *ad hoc* basis rather than pursuant to a VMI agreement. Thus, the industry standard that when parties enter into a VMI agreement they agree to purchase parts remaining in inventory is inapplicable here because addenda B and C are not VMI contracts. Thus, Circle's argument fails.

Next, Circle argues that the trial court erred in denying its request for J.N.O.V. based upon promissory estoppel. Circle's Brief at 19-21.

> Promissory estoppel is defined by Restatement of Contracts (2d)(1979) § 90, which provides in pertinent part:
>
> **§ 90. Promise reasonably inducing Action or Forbearance**
>
> (1) A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if

> injustice can be avoided only by enforcement of the promise. The remedy granted for breach may be limited as justice requires.

**Kreutzer v. Monterey Cnty. Herald Co.**, 747 A.2d 358, 361 (Pa. 2000).

Instantly, Circle argues that

> it is apparent that a promise was made by Keystone, the request by Keystone that Circle [] supply non-Addendum A parts to Keystone, that this promise induced action by Circle [], the purchase of non-Addendum A parts necessary to stock Keystone's facility, that reliance on this promise by Circle [] was reasonable as Keystone actually did receive and pay for such parts for almost a full year, and that injustice can only be avoided by enforcing the promise of Keystone as Circle [] is unable to sell these acquired parts to anyone else.

Circle's Brief at 20.

Again, there is no dispute that Keystone ordered and paid for parts delivered by Circle listed on addenda B and C. However, the record supports the trial court's finding that Keystone never induced Circle to keep a supply in inventory. Accordingly, Circle is not entitled to relief.

Finally, Circle contends that it is entitled to a new trial as the verdict is contrary to the weight of the evidence. Circle's Brief at 21-22. "Our standard of review of the trial court's denial of a motion for a new trial is deferential and limited to a determination of whether the trial court abused its discretion or committed an error of law." **Good v. Holstein**, 787 A.2d 426, 429 (Pa. Super. 2001) (internal citations and quotations omitted).

> [O]ur scope of review on a weight of the evidence claim is very limited. We will respect the trial court's

- 15 -

> findings with regard to credibility and weight of the evidence unless it can be shown that the lower court's determination was manifestly erroneous, arbitrary and capricious or flagrantly contrary to the evidence.
>
> ***Gemini Equipment Co. v. Pennsy Supply, Inc.***, [] 595 A.2d 1211, 1215 ([Pa. Super.] 1991). Thus, our function is to examine the trial court's exercise of discretion and determine if there has been an abuse. We are not free to answer the underlying question of whether we believe that the verdict is against the weight of the evidence. Rather, we must review the court's findings and reasons in light of the evidence adduced only to ensure that the trial judge exercise[d] the duties, yet respecte[d] the confines of his or her particular role in the trial proceeding. This distinction is a fine one, but a very important one; it allows us to correct a palpable abuse of discretion while ensuring that we will not substitute our judgment for that of the [fact-finder].

***Hollock v. Erie Ins. Exch.***, 842 A.2d 409, 417-18 (Pa. Super. 2004) (some citations and quotations omitted).

Instantly, our review of the record compiled in this non-jury trial reveals that the trial court acted within its discretion in concluding that Keystone does not owe Circle for the parts remaining in inventory that are listed on addenda B and C. Consequently, we find no merit to Circle's assertion that the trial court acted contrary to the weight of the evidence.

Having concluding that Circle has not presented any meritorious argument on appeal, we affirm the judgment.

Judgment affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.

Prothonotary


Date: 7/17/2015